IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 10–cv–02734–MSK–KMT


MILLENNIUM LABORATORIES, INC., a California corporation,

      Plaintiff,

v.

ROCKY MOUNTAIN TOX, LLC, a Colorado limited liability company d/b/a FORENSIC
LABORATORIES, and
SLATER LABORATORIES, INC., a Colorado corporation, d/b/a FORENSIC
LABORATORIES,

      Defendants.

---

### ORDER

---

This matter is before the court on "Plaintiff's Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt" ("Contempt Motion") [Doc. No. 44, filed January 13, 2011]. The court has considered both "Defendants' Response to Millennium's Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt" ("Response") [Doc. No. 60, filed February 4, 2011] and "Plaintiff's Reply in Support of Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt" ("Reply") [Doc. No. 66, filed February 14, 2011]. An evidentiary hearing was held on February 23, 2011 and the court has also considered the witness testimony, exhibits and argument presented. The matter is now ripe for review and ruling.

## I.      *Background*

Both Plaintiff Millennium Laboratories, Inc. ("Millennium") and Defendant Rocky

Mountain Tox, L.L.C. d/b/a Forensic Laboratories ("Forensic") are involved in the business of

providing urinalysis services.  Customers for these laboratory businesses include clinical

customers, generally physicians or physician offices, and penal system customers.  The issues in

this case concern clinical customers, usually those physicians' offices involved in pain

management, who require what is commonly known as "point-of-care" services.  A point-of-care

urinalysis involves the laboratory re-testing a urine sample which was preliminarily tested or

"screened" at a physician's office.  The initial screening at the customer clinic would normally

reflect a simple positive or negative result indicating the presence of a certain chemical

compound.  When a point-of-care sample is submitted to a laboratory such as those operated by

both parties, the clinical customer instructs the laboratory to run a quantitative confirmation test

to determine more specifically the concentration of specified chemicals in a patient's body.

Urine samples submitted to a laboratory arrive in a specimen container with a pre-printed

label to which a specific identification number is affixed.  A pre-printed requisition form

containing the same identification number accompanies the urine specimen in order to advise the

laboratory of the patient information and to instruct the laboratory exactly what tests should be

performed.  (*See, e.g.*, Exhibit No. 2 from the hearing conducted on February 23, 2011,

hereinafter "Hrg.Ex.".)

Millennium alleges that in or about September 2010, it learned that its competitor,

Forensic, had misappropriated Millennium's point-of-care requisition form by removing

2

Millennium's name and logo from the form and substituting Forensic's own name and logo.  The accused form was generally known as a "Q Form" at Forensic.[1]  (Contempt Mot. 1-2.) Millennium filed a case in Denver District Court and immediately sought a Temporary Restraining Order ("TRO") from Judge Herbert Stern seeking to enjoin Forensic from further use of the Q Form.

When the parties appeared before Judge Stern at the TRO hearing, Forensic did not object to restraint on its use of the Q Form.  It did, however, object to certain language proposed for inclusion in the TRO presented by Millennium.  The parties do not dispute that on the day of the TRO hearing, Judge Stern insisted the parties adjourn the hearing and meet in a room to work out terms for a stipulated TRO.  After a short discussion, the parties presented a stipulated TRO to Judge Stern, which he approved and signed.  (Hrg.Ex. 1.)  A few weeks later Forensic removed the Denver case to this federal court.  Neither party disputes that Judge Stern's TRO still controls the conduct of the parties and will continue to do so until trial, which has been set before District Judge Marcia S. Krieger on June 1, 2011.

---

[1] Forensic referred to the accused form as a "Q" Form because the specimen and form numbering system associated with this particular point-of-care laboratory service request always began with the letter Q.  Forensic utilized other forms during the relevant time period including a standard form referred to as a "P" form and a separate point-of-care form used when the clinical customer had already run a full laboratory analysis on the sample but merely wanted confirmation of its results, commonly referred to by Forensic as a "L" or "POL" form.  Neither the L or P forms are at issue in this case.

## II.     Dispute

This dispute primarily concerns whether or not language set forth in Exhibit 2 to the TRO imposes upon Forensic a continuing duty to retrieve and impound the Q Form from its active and inactive clinical customers.  Secondarily, Millennium contends that certain admitted failures of Forensic to strictly comply with the terms of the TRO with respect to a small number of customers constitutes contempt of Judge Stern's order, even if only technically, in spite of the fact that Forensic has cured the deficiencies and Millennium has suffered no damage from the breaches.  Millennium seeks a certification of facts supporting contempt to the District Court and a recommendation that Forensic be required to send the TRO letter to all its customers without exception.

### A.     The TRO

The documents presented to Judge Stern on or about October 26, 2010 as part of the stipulation of the parties in restraint on Forensic consist of the following: (1) a three page pleading wherein page 1 is completely consumed by the caption of the case, page 2 consists of provisions one through six, and page 3 consists of provisions seven and eight together with Judge Stern's signature under the phrase, "Approved and So Ordered this 26th day of October, 2010" ("TRO Body"); (2) Exhibit 1, a blank copy of the accused form; and (3) Exhibit 2, a letter referenced on page 2 of the TRO Body ("TRO letter").  (Hrg.Ex. 1.)  The parties agree that only page 2 of the TRO Body, including the reference to the TRO letter, is at issue in this Contempt Motion.

4

Page 2 of the TRO Body states

> 2.  At its sole cost, Forensic shall, within five days of this Order, provide a copy of the letter attached hereto as Exhibit 2 to each of its clinical customers who have received the Form;

*Id*.  The TRO letter states, in pertinent part

> Millennium Laboratories Inc. has filed a lawsuit against Forensic Laboratories alleging that Forensic's requisition forms infringe on Millennium's rights. Forensic denies any wrongdoing.  The Denver District Court has ordered that, pending resolution of the matter on the merits, Forensic shall retrieve all copies of its requisition form, an example of which is enclosed herein.  Please return any such forms in the enclosed postage pre-paid envelope.
>
> Please understand that, as of the date of this letter, Forensic will no longer accept orders on the form.  We appreciate your attention to this matter.

*Id*.

### B.   *Forensic's Compliance Efforts*

Kyle Franzen, Logistics Manager for Forensic, testified at the February 23, 2011 hearing that following the entry of the stipulated TRO, he and others immediately began the process of identifying "clinical customers who have received the Form." (TRO Body at ¶ 2.)  Mr. Franzen testified that processing laboratory requests for point-of-care customers—those subject to the use of the Q Form—is a very small part of Forensic's overall business.  Therefore, in order to properly identify those clinical customers, Mr. Franzen went through a somewhat tedious process of parsing all accounts first into pain management customers verses penal customers and then by dividing the pain management customers into groups according to the sales group handling the account.  Mr. Franzen stated that he then determined whether the customer was one

who could have requested services which would have utilized the Q Form.[2]  He also identified customers as active or inactive.[3]  Once the potential universe of clients was narrowed in this manner, Mr. Franzen and one of his colleagues opened each customer's electronic file to determine if a Q Form template had been created with the customer's business information.

Mr. Franzen explained that various requisition forms for all laboratory services were first created and printed in blank by a professional print company with each form having a unique identification number which matched a collection specimen container as described previously. Forms and specimen containers were intended to be shipped together to a customer based on that customer's business need.  Mr. Franzen explained that when a customer first contracted as a Forensic client with a sales person, a certain number of relevant forms were personalized for that customer by filling in the customer's name, address and other pertinent information on an electronic template which matched the pre-printed, numbered forms.  Creating the personalized pre-numbered forms was then a simple matter of feeding the pre-numbered forms into an on-site printer and printing from the template.  Thereafter, the set of personalized and uniquely numbered forms, together with identically numbered specimen containers, biosecurity shipping bags and materials in which to ship the specimens and lab instructions back to Forensic (collectively called a "lab bag"), were sent to the new customer.

---

[2] For instance, a customer with an on-site laboratory would not use Q Forms, but would only use L Forms or standard forms.

[3] Mr. Franzen identified any clinical customer who had not requested laboratory services within the preceding three months as "inactive."

6

As a result, when Mr. Franzen or other Forensic employees saw that a Q Form template existed in a customer's electronic file, it was assumed for purposes of compliance with the TRO, that the customer had, at one time at least, received a Q Form.  This triggered an obligation to send that customer the TRO letter.  Mr. Franzen testified that these customers were sent the TRO letter by certified mail with a return receipt required to be signed by someone at the receiving end of the shipment.  Mr. Franzen also testified that a postage-paid envelope, returnable to Forensic, was enclosed with each TRO letter to facilitate the explicit request that all unused Q Forms be returned in the envelope.

Mr. Franzen stated that Forensic had been in the process of discontinuing the use of the Q Form when the controversy arose between Millennium and Forensic.  To that end Forensic had created a new form designed to replace both the Q Form and the L Form.  Therefore, for active clinical customers identified as having received the Q Form, Mr. Franzen also sent a shipment of the new replacement form, together with matching items in the lab bag.

Daniel Pederson, Manager of Forensic, testified at the hearing that as part of Forensic's TRO compliance obligations, he personally contacted each of the sales groups responsible for recruiting new customers for Forensic's laboratory services, and advised them Forensic was no longer using the Q Form and requested that any Q Forms the salespersons might have on hand be returned to Forensic and advised them that laboratory requests arriving on a Q Form would not be processed.

Contemporaneously with delivery of the TRO letters, Mr. Franzen testified that he created a spreadsheet containing the names of all customers to whom the TRO letter had been

sent, together with a notation indicating whether new forms had also been sent.  He also began tabulating the delivery status of the TRO letters to facilitate Forensic's obligation to create and file the "certification of compliance" required by the TRO.  (*See* Hrg.Ex. 1 at ¶ 7.) He also began tracking whether any given customer had complied with the request that the Q Forms be returned.

### C. *Non-compliance Issues*

Several iterations of Mr. Franzen's spreadsheet were provided to Millennium over the course of the next several months.  (*See* Hrg.Exs. 13-16.)  Questions about certain entries on the spreadsheets, together with one instance in mid-November, 2010, where a Forensic customer submitted a Q Form to Millennium for processing (*see* Hrg.Ex. 2) after the certificate of compliance had been filed by Mr. Pederson, caused Millennium to become concerned that Forensic was not meeting the terms of the TRO.

The more significant non-compliance issues Millennium noted on the Franzen spreadsheets concerned a number of Forensic customers appearing on the final page of the spreadsheet, beginning with customer "Estrella Mountain Medical Group" and continuing to the end of the list (hereinafter "RHT Customers").  Millennium argues that these customers were not provided with the TRO letter within five days of the issuance of the TRO, in violation of the order.  Other discrepancies noted by Millennium include several customers for whom the recipient of the TRO letter was "Alberto," a sales person associated with Script Lab Solutions, and certain other customers for whom the delivery status of the TRO letter indicated N/A in the "delivery date" and/or the "signed by" sections of the spreadsheet.  (Hrg.Ex. 16.)

8

Additionally, Millennium states that in the "notes" section of the spreadsheets, there were relatively few indications that a customer had actually returned the Q Form to Forensics as required by the TRO letter.  Further, the spreadsheets were devoid of indication of follow up with these customers to gain compliance and return of the Q Forms.  Millennium filed this Contempt Motion after consultation and discovery responses failed to satisfy it that Forensic was substantially following the directives of the TRO.

### 1.    RHT Customers

At the hearing, Mr. Franzen was asked to explain why the RHT Customers, all of whom had likely received the Q Form, did not receive the TRO letter when the original letters were mailed to the other customers.[4]  Mr. Franzen testified that when he received an indication from Millennium—by the filing of the Motion herein—of the possibility that his identification of "clinical customers who have received the Form" might be incomplete, he undertook an extensive audit of Forensic's customer database.  One of the key indicators that there might be a problem, according to Mr. Franzen, was that one customer, Choices Intergrative (sic)[5], serviced by sales group National Medical Testing and Supply ("National Medical"), had sent a completed Forensic Q Form to Millennium requesting point-of-care laboratory services on or about November 16, 2010.  This occurred after the time by which all Forensic Q Form customers should have been notified of the Q Form's obsolescence by the TRO letter.

---

[4] No explanation was asked for or given with respect to the failure to deliver the TRO letter to Danile Sumrock, MD, who was not part of the original RHT group as described *infra*.

[5] As spelled in Hrg.Ex. 16.

Mr. Franzen testified that upon his audit and investigation he discovered that the RHT Customers, including Choices Intergrative (sic) all had originally been brought to Forensic through a sales group called Rapid Health Testing ("RHT").  Mr. Franzen testified that when RHT first brought the customers to Forensic, templates including the Q Form were created and lab bags including the Q Forms were prepared and sent to the RHT Customers.  Subsequently, RHT lost some of its original customer base, and a portion of the RHT Customers became clients of National Medical.  Those customers, however, still utilized Forensic for laboratory processing services; from Forensic's point of view, they were simply serviced by a new sales group, National Medical.  Since Forensic frequently grouped its customers by sales group servicer, presumably because of a commission arrangement, when the sales groups diverged Mr. Franzen remembered that he had deleted the former templates for all the original RHT Customers, including the originally created and shipped Q Forms.  Thereafter, he made new electronic files and re-created templates for members of the now separated group which reflected the correct sales group.  The newly created templates did not include the Q Form because by this time use of the new combined form had been instituted and none of the customers needed either the Q or the L Forms or corresponding lab bags.

Mr. Franzen testified that, as a result of him deleting the original Q Form templates in the customer files of the RHT Customers, when Forensic employees looked at those electronic customer files it did not appear that those customers had ever received the Q Form since there was no template.  Therefore, they were not included in the original list of customers to receive the TRO letter.

Mr. Pederson testified that in early November, 2010, shortly after the TRO letters had been sent to other Forensic customers, six active customers in the original RHT Customer group sent in requisitions for laboratory services on Q Forms.  As they had been instructed by Mr. Pederson at the time the TRO was entered, customer service representatives of Forensic personally contacted each of the six customers[6] and advised them that the Q Form was obsolete and that the submitted lab request would have to be resubmitted on the new form or it would not be processed.[7]  The new forms were then sent to the customers.  Unfortunately, one crucial step was omitted from the process as to these six active customers—they were not also sent the TRO letter.  The customer service representatives, whose role it was to screen all laboratory requests and ensure that no laboratory testing was performed if requested on a Q Form (*see* TRO Body at ¶ 1(a)), were not instructed to also notify Mr. Franzen, whose responsibility it was to ensure compliance with the TRO, so that he could ensure that the TRO letter had been delivered to the client.

As a result, although the six active customers in the RHT Customer group had been instructed they could not use the Q Form, they did not get the TRO letter until late January, 2011, when Mr. Franzen's audit following Millennium's filing of this Contempt Motion revealed

---

[6] The evidence at the hearing indicated that any customer, not just these six RHT Customers, who requested laboratory services using the Q Form was personally contacted by Forensic customer service employees and told they must re-submit lab requests using the new form.  Forensic maintains—and there is no evidence to the contrary—that subsequent to entry of the TRO no laboratory request has been processed using the Q Form.

[7] Choices Intergrative (sic), the customer who had submitted Forensic's Q Form to Millennium for processing in mid-November, 2010, was part of this group. (Hrg.Ex. 16.)

the error.  At that time, as noted on Hearing Exhibit 16, Mr. Franzen personally called each

active former RHT Customer, determined whether they possessed any Q Forms, and in the one

case where the clinic did have Q Forms, he requested return of the forms.[8]  Mr. Franzen then

mailed the TRO letter to the six clinics in the RHT Customer group.  Mr. Pederson testified that

a short time later he also mailed the TRO letter to the other inactive former customers in the

RHT Customer group by regular mail, even though he did not believe they retained any Q Forms

because they were no longer customers of Forensic.

2.      <em>Spreadsheet Notations Indicating No Delivery of the TRO Letter</em>

Millennium asserts that five entries in Mr. Franzen's spreadsheets containing notations

"N/A," indicating that service of the TRO letter had not been made to the customer, proves

violation of the TRO's mandate on page 2 to deliver TRO letters.  Mr. Pederson addressed each

of the "N/A" entries separately during his testimony at the hearing.  As to each one, efforts had

been made by the delivery service or the sales group associated with the account, or both, to

locate the former customer but the physician or clinic could not be located because they had

moved or ceased doing business.  In one case, Black Rock Pain and Pain Specialists, it was later

determined that the clinic had never actually become a customer of Forensic.  A template had

been created on a promise to enter into a contract with Forensic, however the forms were never

sent because the potential customer never actually initiated the appropriate paperwork to receive

---

[8] Hrg.Ex. 16 indicates the clinic returned the forms on January 31, 2011.

the lab bags.  In all other cases, Hearing Exhibit 16 correctly noted that the TRO letter was

undeliverable and the reason therefor.

### 3.      *Customers Associated with Mr. Alberto, Scripts Lab Solutions*

Mr. Franzen testified that Forensic did not employ marketing personnel to actually obtain

and retain customers.  Forensic utilized the services of various sales associations and their sales

employees to recruit business.  Those sales groups appear on the last page of Hearing Exhibit 16,

just above the entries for the RHT Customers, beginning with Practice Optimazation (sic)

Partners and ending with Labgistix.  Mr. Franzen indicated that the TRO letter was sent to each

sales group as indicated on Hearing Exhibit 16.

Mr. Pederson further testified that he personally telephoned the contact person at each

group and explained that the Q Form should be returned if any were in the possession of any of

the sales force.  One of the salesmen for Script Lab Solutions, Mr. Alberto, requested that he be

allowed to personally deliver the TRO letters to his customers so that he could explain what was

needed and retrieve any forms.  Therefore, as to each of Mr. Alberto's clients, Forensic sent the

TRO letter to Mr. Alberto.  Mr. Pederson testified that he contacted Mr. Alberto in early

November, 2010 to ensure that the letters had been hand delivered.  Mr. Pederson testified that

only two of Mr. Alberto's customers had ever received a Q Form and as to each of them, Mr.

Alberto spoke personally to the physician in charge of the practice, delivered the TRO letter and

asked the physician to initial his receipt of the TRO letter on a copy.  There is no dispute that the copies of the TRO letter, as initialed by the physicians, have been provided in discovery.[9]

### D.       Duty Pursuant to the TRO to Retrieve Q Forms from its Customers

Millennium argues that the technical failures outlined *supra* in Section C, under a strict liability approach to the TRO, are violations which support a certification by this court of contempt.  Millennium's more salient contention, however, is that Forensic's failure to follow up with customers who did not comply with the TRO letter by returning unused Q Forms is an ongoing violation of the TRO.  Forensic asserts that it has no duty under the TRO to insure that all unused Q Forms are impounded.  Forensic argues that the Order of the Denver District Court is contained in the TRO Body and that the TRO letter was simply a means by which the parties agreed Forensic would try to retrieve outstanding Q Forms.  Forensic states it always maintained to Millennium and to Judge Stern that forcing third parties to perform in a specified manner, particularly with respect to entities that were no longer using Forensic's services, was impossible and that it had no duty or responsibility to make sure that each and every Q Form was impounded.

Of significance to this court is the undisputed fact that neither Millennium nor Forensic currently use the infamous Q Form (or Millennium's prior iteration) and have not used this form

---

[9] Millennium lawyers stated at the hearing that Forensic provided no explanation in discovery about the letters and therefore Millennium had not understood what the letters represented.

nor honored any laboratory request submitted on the form since at least October 30, 2010 with respect to Forensic and October, 2009, in the case of Millennium.  (*See* Hrg.Ex. 34 at 76.)

### III.    Legal Standard

As a preliminary matter, this court recognizes that it lacks authority to enter a contempt citation under the facts presented here.  Although 28 U.S.C. § 636(e) confers contempt powers on a magistrate judge under certain circumstances, those powers do not extend to civil contempts occurring outside the presence of the magistrate judge in cases not subject to consent under Section 636(c). The contempt procedure applicable to the facts presented here is set out in Section 636(e)(6), as follows:

> [T]he magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before the district judge.

28 U.S.C. § 636(e)(6).

A person charged with civil contempt is entitled to a show cause hearing, to be represented by counsel, to be given adequate notice, and to have an opportunity to be heard.  *See In re Rosahn*, 671 F.2d 690 (2d Cir. 1982); *United States v. Powers*, 629 F.2d 619 (9th Cir. 1980); *United States v. Anderson*, 553 F.2d 1154 (8th Cir. 1977).  A magistrate judge may conduct this show cause hearing, but the magistrate judge functions only to certify the facts and not to issue any order of contempt.  The hearing conducted on February 23, 2011 by this court

provided the respondent, in this case Forensic, with an opportunity to explain its conduct prior to the matter being certified to the district judge for a contempt hearing.  After all, a "court's interest in ensuring a party's compliance with its orders is a great one, enforceable by fines or imprisonment."  *Ohlander v. Larson*, 114 F.3d 1531, 1541 (10th Cir. 1997).  However, when the matter has initially been referred to a magistrate judge, that court may determine that the facts do not warrant a certification to the District Court after hearing all the evidence.

> If the [magistrate judge] finds [the respondent's] explanation to be satisfactory, she may choose <u>not</u> to certify the matter for further proceedings. If this result occurs, the [magistrate judge's] preliminary show cause hearing will have been an efficient means of disposing of the matter. On the other hand, should the [magistrate judge] not be satisfied with [the respondent's] explanation, she cannot adjudicate the matter herself, but must follow the certification process of § 636(e).

*In re Kitterman*, 696 F. Supp. 1366, 1370 (D. Nev. 1988) (emphasis added).  Therefore, as this court interprets the law, should I determine that a civil contempt has occurred, I may certify facts underlying the alleged contempt to District Judge Krieger on the basis of a recommendation. However, if I determine there was no civil contempt, I may decline by Order to certify facts to Judge Krieger and the matter is resolved.

The United States Supreme Court has stated that "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966).  Contempt power is found in 18 U.S.C. § 401, which states, "A court of the United States shall have the power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . . (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

16

The primary difference between orders of civil and criminal contempt is their purpose. Criminal contempt is used to punish the contemnor or vindicate the court's authority; civil contempt seeks to coerce the contemnor into compliance with the court's order or to compensate the complaining party for losses incurred as a result of the contemnor's conduct. *See Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 115 (2d Cir. 1988). Civil contempt "is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *Law v. Nat'l Collegiate Athletic Assoc.*, 134 F.3d 1438, 1442 (10th Cir. 1998) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). In *Ager v. Jane C. Stormont Hospital*, 622 F.2d 496 (10th Cir. 1980), the court explained, ". . . civil contempt is characterized by the court's desire 'to compel obedience of the court order or to compensate the litigant for injuries sustained' . . . . The remedial aspects outweigh the punitive considerations." *Id*. at 500 (citation omitted); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-28 (1994) (civil contempt has a remedial objective and seeks to compel compliance with a Court's order for the benefit of the complainant); *Fed. Trade Comm. v. Kuykendall*, 371 F.3d 745, 751 (10th Cir. 2004) (a contempt sanction is considered civil if it is remedial and for the benefit of the complainant).

An order of civil contempt must be supported by clear and convincing evidence establishing (1) the existence of a valid court order, (2) that the defendants had actual knowledge of the order, and (3) that the defendants disobeyed the order. *Kuykendall*, 371 F.3d at 756-57; *see also Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998). However, the inquiry does not end here.

17

Civil contempt proceedings "are considered to be a part of the action from which they stem." *Id.* at 753.  Where the nature of the sanction in a civil contempt finding is to compel or coerce adherence to a court order, "the court must consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the desired result." *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quotation omitted); *see also Ernest v. Lockheed Martin Corp.*, No. 07-cv-02038, 2009 WL 1698505, at *3-4 (D. Colo. June 16, 2009).  Although the court has "broad discretion in using its contempt power to require adherence to court orders," *United States v. Riewe*, 676 F.2d 418, 421 (10th Cir.1982), "a court must exercise the least possible power adequate to the end proposed," *O'Connor*, 972 F.2d at 1211 (quotation omitted). "To be consistent with these principles, coercive civil sanctions may only continue until terminated by compliance." *O'Connor*, 972 F.2d at 1211 (quotation omitted).  "On the other hand, if a fine is imposed for compensatory purposes, the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy." *Id.* (quotation omitted). "[I]n the absence of evidence showing the amount of the loss, any sum awarded by the court is speculative and therefore arbitrary." *Id*. (quotation omitted).

Since a contempt order is a "potent weapon," *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), courts should not resort to contempt sanctions "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct" *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885).

## IV.     Analysis

### A.     Late or No Delivery of TRO Letter

Forensic, while admitting that human error caused approximately thirteen clinical customers (out of approximately 170) to not timely receive the TRO letter, argues that this small discrepancy, where the active customers received personal notice not to use the Q Form, does not support a certification of facts supporting contempt to the District Court.  Millennium insists that the language of the TRO is clear—"within five days of this Order, provide a copy of the letter attached hereto as Exhibit 2 to each of its clinical customers who have received the Form,"—and since that was not accomplished with the RHT Customers, Forensic is in technical contempt.  The court notes that any non-compliance with the TRO by Forensic with respect to these customers has been cured as of the end of January, 2011.

Although it persists in seeking contempt as a sanction against Forensic, Millennium has wholly failed to address any harm to which it came by virtue of the late transmissions of the TRO letter to the RHT Customers.  It is undisputed that Forensic did not honor or preform any laboratory service request when six of the RHT Customers sent their lab orders on a Q Form.  Further, as noted, once the mistake with respect to the RHT Customers was discovered, immediate steps were taken to rectify the problem, albeit after Millennium had filed this Contempt Motion.  This court concludes there are fair grounds to doubt the wrongfulness of Forensic's conduct.  Instead, this court finds this mistake happened as a result of one person's error in compiling—from thousands of customers—a narrow list of less than 200 customers, many of whom were no longer active clients of Forensic.

19

"Civil contempts provide a remedy for a party who has been injured by the violation of a court order" either by coercing compliance or by awarding damages associated with non-compliance.  *Hyde Constr. Co. v. Koehring Co.*, 388 F.2d 501, 511 (10th Cir. 1968).  There is no need to coerce Forensic into compliance since it has complied.  The compliance was not timely, but the deficiencies have been cured.  Further, there is no reason to impose a monetary sanction. As the Tenth Circuit has held, monetary sanctions must only be imposed for compensatory purposes in an amount based upon "the complainant's actual losses sustained as a result of the contumacy."  *O'Connor*, 972 F.2d at 1211.  That number is zero with respect to the RHT Customers.  Therefore, this court declines to certify facts in favor of a contempt to the District Court on these grounds.

With respect to the TRO letters sent to Mr. Alberto and timely mailings to customers for whom delivery was impossible due to inability to locate them, this court finds there is no violation of the TRO, even technically.  The uncontradicted evidence is that Mr. Alberto personally provided the TRO letter to each of his customers who had ever received a Q Form, by hand delivery and with personal explanation.  The TRO does not say the TRO letter must be mailed; it says it must be "provided."  (Hrg.Ex. 1 at ¶ 2.)

Further, Forensic took steps to provide the letters to several former customers who had moved or gone out of business but was unsuccessful.  In attempting compliance with a court order it is not reasonable to expect a party to achieve the unattainable.  As to each of the identified customers, Forensic was able to provide an explanation about steps taken to locate the

former, now inactive, customers.  To do ones best but still fail is not "disobedience or resistance to [a court's] lawful writ."

Therefore, this court cannot certify facts supporting contempt of court on either of those two bases.

### B.    Continuing Duty to Retrieve and Impound Q Forms

Millennium argues that Forensic had a duty to follow up with customers and former customers who did not respond to the TRO letter by returning Q Forms.  Millennium acknowledges, however, that there is no time limitation attached to this alleged duty.  Forensic argues that the TRO Body does not contain any such requirement; the only reference to a duty to retrieve outstanding Q Forms is in the TRO letter.  Forensic maintains that the language requiring retrieval of the forms from its laboratory customers was purposefully deleted from Millennium's original proposed TRO Body and should not be construed as part and parcel of the TRO.  Millennium counters that this court should incorporate the language of the TRO letter into the TRO Body and construe both documents together to determine the court's prohibitions and requirements.  For that proposition, Millennium relies upon contract law, citing the court to *Roemmich v. Lutheran Hospital & Homes Society of America*,  934 P.2d 873, 875 (Colo. App. 1996).

Contract law, however, is not controlling in this civil contempt proceeding which is based upon an injunctive order.  In *Consumers Gas & Oil, Inc. v. Farmland Industries, Inc.*, 84 F.3d 367, 370-371 (10th Cir. 1996), a settlement agreement prohibited the parties from publishing information about the settlement.  In breach of the agreement, a party published

21

information about the settlement, and civil contempt was sought for breach. The Tenth Circuit reversed the district court's finding of contempt. It stated, "Standing alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt."

Fed. R. Civ. P. 65(d), "Contents and Scope of Every Injunction and Restraining Order," governs the construction of injunctive orders. "[T]he term 'injunction' in Rule 65(d) is not to be read narrowly but includes all equitable decrees compelling obedience under the threat of contempt." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2955, at 309 (1995).

Rule 65(d) provides in part,

> Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, <u>and not by reference to the complaint or other document</u>, the act or acts sought to be restrained.

Fed. R. Civ. P. 65(d) (emphasis added). The rule is phrased in mandatory language. "[It] expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document." *Consumers Gas & Oil*, 84 F.3d at 370-371 (citing *Thomas v. Brock*, 810 F.2d 448, 450 (4th Cir. 1987)). The proscription against incorporating by reference documents outside of the four corners of the court's order protects those who are enjoined by informing them of the specific conduct regulated by the injunction and subject to contempt. *See* Wright, Miller & Kane, § 2955, at 310.

The Tenth Circuit has held

> After reviewing the authorities presented by the parties and conducting our own research, we are persuaded the better view is to construe Rule 65(d) strictly and thereby give effect to its plain, mandatory language. By reaching this result, we refrain from substituting ad hoc uncertainty for the rule's uniformity and clarity, and we advance two important functions performed by the rule: (1) to prevent confusion on the part of those faced with injunctive orders and (2) to aid the appellate court in defining the bounds of the injunctive relief.

*Consumers Gas & Oil*, 84 F.3d at 371; *see also Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1168 (10th Cir. 2009) (Rule 65 "expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document"); *In re Zipper,* 207 B.R. 695, 698 (Bankr. D. Kan. 1997).

When Millennium first requested a TRO from Judge Stern, Millennium had attached to its motion a proposed restraining order. [*See* Doc. No. 1, Ex. B, "Plaintiff's Motion for a Temporary Restraining Order," filed in Denver District Court on October 20, 2010, Ex. 1, "Proposed Order" (hereinafter "Proposed TRO")]. The Proposed TRO stated, "2. Forensic shall notify *each* of its customers of the claims in this action and shall, at Forensic's cost, *provide for the return and impoundment* of Forensic's infringing requisition forms; . . . ." (*Id.* at 31 (emphasis added).) As noted at the TRO hearing, Judge Stern required the parties to adjourn to an anteroom to discuss a stipulated TRO.

Mr. Pederson, who was present at those negotiations, testified that Forensic refused to stipulate to language directing Forensic to retrieve and impound any outstanding Q Forms because Forensic believed that complying with that kind of provision would be impossible. Mr. Pederson testified that Forensic did not exercise control over the third party laboratory customers, either active or inactive. Forensic did agree, as part of the stipulation between the

parties, to attempt to persuade all customers who received the Q Form and who still had copies of Q Forms to return them to Forensic.  Therefore, the ultimate stipulated language in the TRO Body was modified to read, "2. At its sole cost, Forensic shall, within five days of this Order, provide a copy of the letter attached hereto as Exhibit 2 to each of its clinical customers who have received the Form."  This was the Order that Judge Stern signed and approved.

The parties put the language about returning the form in a separate document which memorialized their agreement about the return of the Q Forms from the third parties.  The TRO letter which was not part of Millennium's original request to the court then stated, "The Denver District Court has ordered that, pending resolution of the matter on the merits, Forensic shall retrieve all copies of its requisition form, . . . ."  (TRO letter.)  In fact, this representation was false; Judge Stern had not ordered Forensic to retrieve all copies of its requisition form.

Also changed from the Proposed TRO was the requirement that Forensic notify all of its customers about the lawsuit.  That part of the Proposed TRO was directly modified in the TRO Body to require Forensic to notify "each of its clinical customers who have received the Form." By this change in the TRO Body, this court is convinced that the parties knew the difference between modifying the restraining order signed by Judge Stern (changing all customers to only a portion of the customer base) verses the memorialization of an agreement between the parties which was not part of the injunctive order (retrieving all copies of the requisition form.)

To read into the TRO signed by Judge Stern the requirement set forth in the TRO letter is contrary to Tenth Circuit law and the Federal Rules of Civil Procedure and also appears contrary to the intent of the parties who together purposefully took that provision out of the body of the

TRO and rephrased it in a letter designed to gain compliance of Forensic's customers.  This

court finds that the TRO entered by Judge Stern is clear and unambiguous and does not contain

any requirement that Forensic retrieve and impound outstanding copies of the Q Form.

However, even if there were some ambiguity,

> the [TRO] must not be read in the light most favorable to the [complainant], but
> rather must be strictly construed to ensure it is clear enough to place a defendant
> on notice of what he must do to comply. Any ambiguities should be read in the
> light most favorable to the defendants.

*Kuykendall*, 371 F.3d at 760-61 (citations ommitted).

The TRO, read without reference to outside documents, required only that Forensic

provide to each of its customers who received the Q Form, a copy of the TRO letter.  Given that

there is no duty on the part of Forensic to retrieve unused Q Forms or to follow-up with

customers, there is no breach of the TRO associated therewith.  Therefore, this court declines to

certify facts to the District Court in support of civil contempt on this basis.

### V.    *Conclusion*

Millennium's participation in the drafting of the Stipulated TRO and letter to Forensic's

customers, together with Millennium's requested "remedies" for what it characterizes as

"contempt" causes this court unease concerning the motives for bringing the instant motion.

First, Millennium has requested that, as a remedy for minor discrepancies in timing, the court

require that the TRO letter be sent to all Forensic's customers.  It is inexplicable how this would

further Millennium's expressed desire to remove the long-obsolete form from the stream of

commerce, since most of Forensic's customer base does not use point-of-care laboratory services

and would never have even seen the Q Form.  Alternatively, Millennium has requested only a finding of contempt against Forensic, without any enforceable sanctions, although its attorneys obviously spent many hours preparing the Motion and the Reply as well as participating in a day-long hearing.  The thinly disguised goal, therefore, appears to be simple reputation besmirchment to gain a competitive advantage in commerce rather than a sincere desire to either enforce compliance with an order of the court or to obtain compensation for losses or damages sustained by reason of noncompliance.

It is therefore **ORDERED**

"Plaintiff's Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt" [Doc. No. 44] is **GRANTED IN PART and DENIED IN PART.**

1.  The Motion is **GRANTED** insofar as Defendant Rocky Mountain Tox, LLC, a Colorado limited liability company d/b/a Forensic Laboratories has been required to and did appear before this court to answer to charges of civil contempt.

2.  The Motion is **DENIED** in that this court will not certify facts to the District Court nor recommend that civil contempt be found or sanctions imposed therewith.

Dated this 8th day of March, 2011.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge